UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:11-cv-21321-JAL- LENARD/O'SULLIVAN

ETKIN & COMPANY, INCORPORATED,
a Delaware corporation,

      Plaintiff,

v.

SBD, LLC, a Florida limited liability company,

      Defendant.

_____/

**COUNTER-DEFENDANTS', ETKIN & COMPANY, INCORPORATED, AND
WILLIAM ETKIN, MOTION FOR SUMMARY JUDGMENT AS TO
SBD'S COUNTERCLAIM AND
SBD'S FIRST, SECOND, THIRD AND FOURTH AFFIRMATIVE DEFENSES**

      Counter-Defendants, Etkin & Company, Incorporated ("ECI") and William Etkin ("Mr. Etkin"), pursuant to Fed.R.Civ.P. 56, hereby move the Court to enter summary judgment as to all claims set forth in SBD, LLC's ("SBD") Counterclaim and as to SBD's First, Second, Third and Fourth Affirmative Defenses, and in support, thereof state:

**I.**      **Brief Summary**

      In response to a straight-forward breach of contract claim, SBD responded with an outrageous and vexatious personal attack on Mr. Etkin in the guise of a "Counterclaim." These purported "Counterclaims" were not filed in good faith and were designed to delay this case and avoid judgment day. While the standard of review on a Motion to Dismiss requires the Court to accept "as true" the allegations in the Counterclaims, it is an entirely different matter at this point when the Court is required to examine the evidence - and in this case - the stunning absence of

evidence to support the outrageous allegations made by SBD.  The egregious misconduct by SBD in discovery was only the prelude, if not the "cover", for what has happened here.  For these reasons, we have simultaneously asked the Court to consider converting our Motion to Dismiss SBD's Counterclaim as a supplement to this instant Motion for Summary Judgment, while incorporating our Motion to Dismiss as well as our Motion for Rule 11 Sanctions.  We ask that judgment be entered in favor of ECI and Mr. Etkin on all Counterclaims and Affirmative Defenses raised by SBD, that partial judgment be entered in favor of ECI on Count I of its Complaint, and that the Court grant ECI's Motion for Leave to Amend so that the full context of damages and other relief can be determined by this Court.

## II.   <u>Introduction</u>

After working closely together for over six months with no contract between them, on March 23, 2010, SBD and ECI entered into a fully-negotiated, long-term Consulting Agreement ("Agreement"). Numerous breaches of the clear and unambiguous terms of that Agreement are the basis of ECI's straightforward Complaint for breach of contract and declaratory relief against SBD[1].

The Agreement contemplated a five year, non-exclusive business relationship between the parties. And, other than in the event of a material breach that went uncured by the breaching party for 45 days following receipt of detailed written notice,[2] the Agreement, by its express terms, could not be terminated by either party prior to December 31, 2011.

There were sound business reasons for the parties to have entered into a long-term Agreement, and for the Agreement to contain each of the specific terms that it did. In 2004, long

---

[1] ECF No. 1.
[2] ECF No.1, Exhibit A.

2

before any relationship between ECI and SBD, Kraft Foods ("Kraft") and SBD had entered into a multi-year licensing agreement that would pay SBD royalties for Kraft's use of SBD's South Beach Diet brand on certain enumerated food products[3]. In fact, by 2006 Kraft-produced South Beach Diet food products were generating over $325 million in sales, and royalty and other payments from Kraft and other licensees to SBD exceeded $16 million[4]. By 2009, however, Kraft had abandoned all but a few product categories (retaining pretty much only protein and cereal bars), sales of Kraft-produced South Beach Diet food products had declined to $115 million, and were expected to fall further in 2010, and royalties to SBD from Kraft had declined to license agreement minimums[5]. In February 2010, Kraft notified SBD that the Kraft/SBD relationship would be ending altogether, and that Kraft would not be renewing the parties' 2004 license agreement when it was set to expire by its own terms in March 2011[6].

ECI's compensation for its consulting services under the Agreement were largely contingent, with one contingent component linked to percentages of SBD's "Prime Gross Profit," a term defined in the Agreement, but essentially SBD's revenues from licensing and other income minus certain enumerated expenses[7].  Since royalty payments from Kraft to SBD had accounted for the overwhelming majority of SBD's revenues since 2005, the parties recognized, and the Agreement anticipated, the very real possibility that SBD could be without significant revenues, and by extension, that ECI could be obligated to provide strategic consulting services without current compensation for years (if not for the full five years) as the parties collaborated

---

[3] Statement of Material Facts in Support of Motion for Summary Judgment, ¶ 4.
[4] *Id.* at ¶ 6.
[5] *Id.* at ¶¶ 7 and 9.
[6] *Id.* at ¶ 8.
[7] ECF No. 1, Exhibit A.

3

on rebuilding SBD's business and replacing the lost Kraft revenues[8]. It was against this factual background that SBD, its lawyers and advisors negotiated and entered into the strategic, long-term business consulting relationship with ECI set forth in the Agreement.

One of the early and immediate challenges that ECI and SBD faced was presented by SBD's having failed to negotiate and include any "exit strategy" into the Kraft 2004 license agreement. In fact, in Spring 2010 Kraft took the position that SBD was precluded from communicating with or providing information (including even the expiration date of the Kraft license) to a new or successor licensee until after the expiration of the original term of the license in March 2011[9]. Under those circumstances, SBD's once fast-growing, and still very profitable, protein and cereal bar business would end, and it's products would disappear from retail store shelves, save only remaining Kraft inventory that it would have the right to "run out" over several months following expiration of the term of the license.  ECI recognized the significant value in, and importance of, not allowing the SBD bar business to simply "die on the vine"[10]. Even at dwindling 2010 levels, Kraft's SBD bar business still accounted for over $60,000,000 in retail sales and generated between $10,000,000 and $15,000,000 of Earnings Before Interest Taxes Amortization and Depreciation (EBITAD) before discretionary advertising expenses (projected to total approximately $4,000,000)[11].

ECI pointed out, and SBD management agreed, that permitting the SBD bar business to simply disappear from store shelves would severely damage the remaining value of the brand itself, and accordingly, a better approach would be to work with Kraft to preserve the existing business and, once having done so, to later align with a strategic or financial partner or new

---

[8] ECF No. 1, Exhibit A.
[9] Statement of Material Facts in Support of Motion for Summary Judgment, ¶ 11.
[10] *Id.* at ¶ 10
[11] *Id.* at ¶ 9.

4

licensee[12].   Kraft was amenable to this idea and, following months of consideration and discussion, a series of Term Sheets were produced and following general Kraft and SBD agreement on the broad terms of an agreement, drafts of transactional documents were prepared, exchanged and negotiated.

On December 15, 2010 after a secret meeting that neither Mr. Etkin nor any representative of ECI was invited to attend, and which meeting was conducted by another "consultant," who at deposition admitted that he had not even read the proposed transaction documents, SBD concluded that the proposed transaction was not in its best interest, and without advising ECI or allowing ECI to speak to and understand what the other "consultant" had said, SBD terminated the proposed transaction with Kraft[13]. Thereafter, SBD failed to make payments due to ECI pursuant to the Agreement, and ECI brought its Complaint.

On or about December 2, 2011, SBD filed its Answer, Affirmative Defenses and a multi-count Counterclaim[14] against ECI, and added Mr. Etkin, personally, as an additional party, with respect to an otherwise straight-forward breach of contract claim.  The Counterclaim purportedly sets forth the following claims: (1) fraud in the inducement; (2) negligent misrepresentation; (3) breach of fiduciary duty; and (4) breach of contract[15].

As we stated from the outset of this case, SBD's Counterclaim is, at best, a fatally defective action for breach of contract given SBD's failure to provide ECI with the required written notice and opportunity to cure the alleged breaches of contract.  Recognizing the futility of its position, SBD tried to avoid the clear and unambiguous provisions of the parties' Agreement by alleging that ECI had made one unwritten representation after another, and had

---

[12] *Id.* at ¶ 10.
[13] *Id.*  at ¶¶ 46 and 47.
[14] ECF No. 92.
[15] *Id.*

5

promised and failed to provide one unwritten service after another, none of which were contemplated by the parties, reflected in any communications between the parties, reflected in the Agreement or even reflected in any of the many drafts of the Agreement.  Since, we have both moved to dismiss the Counterclaim in its entirety,[16] and moved for sanctions under Rule 11 for SBD's failure to have complied with a mandatory condition precedent, i.e. written notice and an opportunity to cure any purported default under the Agreement[17].  For the sake of judicial efficiency, we adopt and reincorporate each and every argument contained in our Motion to Dismiss[18], Reply in Support of Motion to Dismiss[19] and Motion for Rule 11 Sanctions[20] as if fully set forth herein.  We would also point out that should the Court deny all or a portion of our Motion to Dismiss under the appropriate Rule 12 standard, with fact discovery now concluded and with minor limited exceptions, this Motion will serve to ***supplement*** our position which unequivocally establishes that the alleged misrepresentations attributed by SBD to Mr. Etkin in its Counterclaim – never happened, ***according to the testimony of SB's own witnesses***.  Thus, ECI and Mr. Etkin are entitled to judgment as a matter of law.

With respect to SBD's Affirmative Defenses, the Motion will address SBD's First Affirmative Defense (illegality), Second Affirmative Defense (breach of contract), Third Affirmative Defense (fraud in the inducement) and Fourth Affirmative Defense (fraud in the performance). These defenses must fail because are either wholly dependant on the untenable allegations and/or counts from the Counterclaim or are based upon facts which clearly don't support such defenses.

---

[16] *See*  ECF No. 100 (Motion to Dismiss); ECF No. 134 (Reply in Support of Motion to Dismiss).
[17] ECF No. 200.
[18] ECF No. 100.
[19] ECF No. 134.
[20] ECF No. 200.

Accordingly, because the history of the case makes clear that there are no genuine issues of material fact in dispute, ECI and Mr. Etkin are entitled to summary judgment in their favor as a matter of law.

## III.   Legal Standard For Summary Judgment

A motion for summary judgment should be granted where "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1223 (11th Cir. 2004)(quoting Fed.R.Civ.P. 56(c)). Although the Court must view all evidence and make all reasonable inferences in a light most favorable to the party opposing summary judgment, the Court should enter summary judgment if, under the governing law, there can be but one reasonable conclusion. *Chapman v. AI Transp.,* 220 F.3d 1012, 1023 (11th Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no `genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Further, "[t]he existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; the requirement is that there be no *genuine* issue of *material* fact." *Dominguez v. Lake Como Club*, Case No. 8:10-cv-2793, 2012 U.S. Dist. LEXIS 63141, *5 (M.D. Fla. May 4, 2012)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## IV.   SBD's Breach Of Contract Claim Is Barred For Failure to Comply With The Written Notice And Cure Provision Of The Agreement

7

The Agreement is, by its express terms, a long-term consulting agreement with contingent compensation to ECI.  ECI was required to perform the services "in good faith, in a manner Etkin reasonably believed to be in the best interest of the Company, and with such care as an ordinarily prudent person in like position would use under similar circumstances[21]."  To the extent that SBD ever believed that ECI or Etkin was failing to fulfill their obligations under the Agreement, in a material respect, the Agreement obligates SBD to provide detailed, written notice, specifying the performance failures and providing ECI and Etkin with 45 days to cure the alleged failures.

As fully briefed in our Motion for Rule 11 Sanctions, which brief is incorporated herein, under Florida law a plaintiff ***must*** comply with a contractual obligation to provide written notice of a breach and opportunity to cure before a breach is actionable.  Because SBD failed to comply with express written notice and cure provisions of the Agreement, its breach of contract claim is barred and the Court should grant summary judgment in favor of ECI and Mr. Etkin. *See e.g. Morris v. Knox Corp.*, 13 So.2d 914 (Fla. 1943); *Saunders Leasing Sys., Inc. v. Gulf Central Distribution Center*, 513 So.2d 1303 (Fla. 2d DCA 1987); *Florida Recycling Svs, Inc. v. Greater Orlando Auto Auction, Inc.*, 898 So.2d 129 (Fla. 5th DCA 2005).

It is undisputed that the parties' Agreement, Section 7(a)(iii)[22], contains a clear and unambiguous default provision which states:

> If either ECI or Etkin, on one hand, of the Company [SBD], on the other, **fails in a material respect to fulfill ECI's or the Company's obligations under this Agreement and that failure continues for more than 45 days after notice of the failure by the non-defaulting party that says that failure to correct the failure will constitute a basis for terminating this Agreement, the non-defaulting party will have the right to terminate this Agreement by at least 30 days' prior**

---

[21] ECF No. 1, Exhibit A; Statement of Material Facts in Support of Motion for Summary Judgment, ¶ 16.
[22] ECF No. 1, Exhibit A.

8

**written notice** given at any time after the end of the 45 day period while the failure continues. If Etkin fails to fulfill any obligations under this Agreement, ECI will be the defaulting party. [Emphasis Added].

Courts strictly construe contractual written notice requirements. *World Triathlon Corp. v. SRS Sports Center SDN.*BHD, Case No. 8:04-CV-T-24-TBM, 2005 WL 192479 (M.D. Fla. Aug. 10, 2005). It is an uncontroverted fact that SBD's January 20, 2011 letter[23] ("SBD Letter"), sent to ECI over a month <u>after</u> SBD had terminated the Kraft transaction was SBD's one, and only, purported attempt to provide ECI with any notice of an alleged breach of the Agreement[24]. The SBD Letter, drafted by SBD's self-styled "consigliore," "friend and litigator, Andy Hall" fails to provide the proper, requisite notice for several reasons; it is untimely, it fails to provide a bone fide opportunity to cure (by demanding $9,000,000 in baseless, arbitrary damages from ECI, an amount Mr. Hall admitted he largely conjured up himself) and, ultimately, by declaring the Agreement *void* as allegedly procured by fraud, Mr. Hall precluded any possible opportunity to "cure." Moreover, and further fatal to its claim, SBD testified that even if ECI and Etkin were to have paid the $9,000,000 demanded as a "cure", ECI would still not have been permitted to resume performing the services called for under the Agreement, which services ECI was ready, willing, able and intending to provide.[25] (See ECI Complaint for Declaratory Relief determining that the Agreement had ***not*** been terminated). Accordingly, SBD's breach of contract claim as well its Second Affirmative based upon ECI and/or Mr. Etkin's breach of contract are barred for failure to comply with a condition precedent.

    A.    *The SBD Letter Declared The Agreement Was Void*

---

[23] Statement of Material Facts in Support of Motion for Summary Judgment, ¶
[24] *Id.* at ¶ 53.
[25] *Id.* at ¶ 52.

9

The SBD Letter clearly and unambiguously declared the Agreement to be **void** (not even voidable) as the product of fraud in the inducement[26], and therefore **non-existent** from its purported inception. No reasonable person accused in a six page, single spaced type written "rant" purporting to document myriad alleged breaches occurring over the prior 15 months could possibly understand such a letter as providing proper notice of default and requesting a good faith effort to "cure" alleged performance deficiencies in a contract that SBD's litigator had just declared to be a "void" and non-existent.

B.      *SBD's January 20, 2011 Letter Was Untimely To Permit A Cure By ECI*

The SBD Letter was provided to ECI long after it was no longer possible to cure any of the alleged breaches.  In fact, virtually every "incident" complained of by SBD had occurred somewhere between over a month to well over a year before ECI received the SBD Letter. In one notable case the SBD Letter chastised Mr. Etkin's treatment of Dave Owens, a former food industry executive, at a meeting that took place with the principals of SBD in October 2009 – more than 5 months **prior** to the execution of the parties' Agreement[27] and almost 15 months prior to the SBD Letter.

As frivolous as SBD's claim against ECI is as it relates to Mr. Owens, SBD has since admitted that there are numerous other allegations against ECI asserted in its Counterclaim that SBD did not consider to be breaches of the Agreement at the time.  For, instance, SBD admitted that the July 7, 2010 meeting with Howard Schultz was not a breach of the Agreement[28], nor was the October 13, 2010 Starbucks meeting in Seattle[29].  Because SBD has testified did not consider ECI in breach at or within a reasonable time after the time the actual events took place in 2009

---

[26] *Id.* at ¶ 54.
[27] *Id.*
[28] *Id.* at ¶ 41.
[29] *Id.* at ¶ 43.

10

10136984.2

and 2010, it should not be permitted to retroactively rewrite history in 2011 and 2012 in order to manufacture breach claims in support of an improper breach of contract action.

Further, ECI's purported failures and material breaches regarding the failed Kraft transaction took place over the course of 2010, culminating with SBD management's decision to terminate discussions with Kraft on or about December 15, 2010[30].  SBD failed to give ECI notice, and deprived ECI of an opportunity to "cure" at the time of alleged breaches by, among other things, engaging in secret meetings from which Mr. Etkin and ECI were excluded. SBD may not now avoid the consequences of its failures in an effort to pass off an "after the fact" written tirade from Mr. Hall as constituting proper, contractual notice, particularly given that SBD had chosen to terminate discussions with Kraft and it was impossible for Mr. Etkin and/or ECI to cure, even if there was something to cure. *See Abecassis v. Eugene Cummings, P.C.*, 2012 U.S. App. LEXIS 2910 (11th Cir. Feb. 15, 2012)(affirming dismissal of breach of contract claim where plaintiff's default notice was sent after a cure was no longer possible thereby depriving defendant of a genuine opportunity to cure).

In fact, while SBD testified that it purportedly had concerns about ECI's performance in connection with the Kraft transaction as early as November 2010 and that it sought advice from its accountant, Mr. Tim Devlin, regarding the Agreement's termination provisions shortly thereafter,[31]ECI had no idea, and no way of knowing, that SBD was thinking that ECI allegedly was, or had ever been, in breach of the Agreement.  SBD never told informed ECI that it was investigating whether to terminate the Agreement, depriving ECI of a valuable opportunity to address, or resolve, SBD's concerns, or to cure any performance failures.

---

[30] ECF No. 92, ¶ 67
[31] Statement of Material Facts in Support of Motion for Summary Judgment, ¶ 44.

11

The very first time Mr. Etkin was ever told of any concern with ECI's performance was in a December 16, 2010 telephone call from a very angry and antagonistic attorney Andrew Hall. Attorney Hall admitted that during this call he advised Mr. Etkin to "get a lawyer.[32]" Completely blindsided by the suggestion that he should "get a lawyer," Mr. Etkin tried to obtain clarification from Mr. Hall and Mrs. Agatston regarding the basis for this advice.[33] Neither Mr. Hall nor Mrs. Agatston ever responded to him.[34] Thus, even when Mr. Etkin made direct inquiry of SBD if there was a problem and if so, what the problem was, SBD *refused* to respond, once again depriving ECI of its right to notice and any opportunity to cure.

     C.     *The Cure Demanded By SBD Was Arbitrary*

SBD's arbitrary demand for an unliquidated sum of $9,000,000 in order to "cure" is conclusive evidence that the SBD Letter never intended to provide good faith notice and a bona fide opportunity to cure.   At his deposition, Mr. Hall, SBD's lawyer and self-described "consigliore," testified that the $9,000,000 demand on ECI was nothing more than *his* "estimate" of what he alone, without input from anyone at SBD or any expert identified as damages from ECI's purported breaches and "lost opportunities[35]." Mr. Hall's manufactured demand for an arbitrary, multi-million dollar sum reeks more of an effort to insure that there was no opportunity to cure, than a good faith invitation to cure.

Further it was impossible to know on January 20, 2011 where SBD would even suffer a "lost opportunity," especially where SBD testified that it had never itself even bothered to investigate the existence of any alternative opportunities.   SBD explained that it "*never* investigated what potential licensees were out there or what [it] could or could not do or who

---

[32] *Id.* at ¶ 48. Mr. Hall later testified that at the time he made this statement, he was not speaking on behalf of SBD.
[33] *Id.* at ¶ 49.
[34] *Id.* at ¶ 49.
[35] *Id.* at ¶ 56; *see also* ECF No. 1, Ex. A

could potentially run this business or what company might potentially want to do a joint venture or do a business with [it] or do something else where [SBD] would retain more control. [SBD] *never* investigated any of those options, so [it] does not know what would have been[36]". Noteworthy that the Kraft-SBD License Agreement was not due to expire until March 1, 2011 and SBD was due to receive (and did, in fact, receive following expiration of the license agreement) a $6,100,000 royalty payment, which coincidentally matches exactly a $6,100,000 component of Mr. Hall's "cure" demand on ECI. Accordingly, SBD's demand of ECI for $9,000,000 was arbitrary, unjustified and designed to preclude any bona fide "cure."

> D.   *Even If ECI "Cured", SBD Wouldn't Have Permitted The Agreement To Continue Under The Same Terms and Same Compensation*

Even if ECI and/or Mr. Etkin had been able to, did, in fact, cure the alleged breaches set forth in the SBD Letter and paid the arbitrary $9,000,000 demanded, SBD would still *not* have permitted ECI and/or Mr. Etkin to resume its performance or receive the same bargained for compensation under the Agreement.  SBD and its principals admitted that as of December 27, 2010 they no longer wanted to be working with Mr. Etkin[37].  Instead, the testimony was that going forward Mr. Etkin "would have basically been reduced to a level that his skill warranted, he would have been limited to what he was licensed to do, and he would have basically disgorged what was improper and [SBD] would have gone from there[38]". SBD further evidenced its intent that a new arrangement would have likely been limited to Starbucks with different compensation terms,[39] stating that if a deal with Starbucks would come to fruition, SBD would

---

[36] *Id.* at ¶ 55.
[37] *Id.*  at ¶ 50.
[38] *Id.* at ¶ 57.
[39] *Id.* at ¶ 58.

still be willing to pay for that because that was "the only thing theoretically good that he [Mr. Etkin] did[40]".

Accordingly, because SBD neither intended to permit ECI to resume performance of the bargained for services it had been providing since inception of the Agreement, nor intended to permit ECI to receive the benefit of its bargained for consideration under the Agreement – even if ECI "cured" as arbitrarily demanded – any purported opportunity to cure offered by SBD was illusory.

**V.**  **The Integration/Merger Clause Bars SBD's Fraud In The Inducement And Negligent Misrepresentation Claims[41] And Defenses**

>   A.   *The Agreement Was The Product Of Extensive Arms-Length Negotiations With All Parties Represented By Counsel*

As we thoroughly briefed in our Motion to Dismiss and Reply, and which we incorporate herein, it is undisputed that the parties' Agreement[42] was the product of extensive, arms-length negotiations during the many months prior to execution, with each side represented by experienced legal counsel and other advisors.  SBD was represented not only by Ed Ristaino, Esq.[43] and the Akerman Senterfit law firm, but also by Tim Devlin, its accountant and trusted business advisor[44], and Andy Hall, its "consigliore," general counsel and "trusted friend and litigator" during the negotiation of the Agreement. None of Andy Hall, Esq., Tim Devlin or Dr. Agatston testified that they performed any due diligence as to Mr. Etkin's background and expertise[45].

---

[40] *Id.* at ¶ 58.
[41] To the extent that SBD's allegations of fraud in the inducement and negligent misrepresentation are a part of SBD's Breach of Fiduciary Duty Claim (Count III), the Court should grant summary judgment on this claim as well.
[42] ECF No. 1, Exhibit A
[43] *Id.* at ¶ 17.
[44] *Id.* at ¶ 17.
[45] *Id.* at ¶ 18.

14

The Agreement was tailored to SBD's unique needs, and the long term strategic consulting relationship contemplated by the parties. There is nothing remotely boilerplate about the Agreement. The Agreement began with informal negotiations[46], progressed to a term sheet[47], and then to formal drafting[48] - with much back-and-forth and multiple drafts being circulated before the parties executed the final Agreement months later[49].   For this reason, the Agreement includes a clear and unambiguous merger/integration clause which states that "**[t]his Agreement constitutes the entire agreement of the parties with respect to the subject matter of this Agreement, and supersedes all prior written or oral agreements or understandings**.[50]" [Emphasis Added].  Everyone agreed that the only representations and warranties that they were making to each other were as expressed in the Agreement.

Where the parties were represented by counsel who actively participated in the drafting of a contract, Florida law does not permit a party to avoid the effect of a merger/integration clause with unsupported allegations of fraudulent representations which were ***never*** included in the Agreement. *See e.g. Saunders Leasing Sys. Inc.*, 513 So.2d 1303 (Fla. 2d DCA 1987); *Pettinelli v. Danzig*, 722 F.2d 706 (11th Cir. 1984); *General Electric Co. v. Info. Servs., Inc.*, 126 Fed. Appx. 209 (6th Cir. 2005).

> B.      *Dr. Agatston Chose Not To Read The Agreement Prior To Signing*

If Dr. Agatston believed that the Agreement failed to capture material representations, or that the merger clause was contrary to his own understanding, it was his responsibility to alert ECI, or at minimum, his own lawyers at Akerman Senterfit.  However, Dr. Agatston admitted

---

[46] *Id.* at ¶ 19.
[47] *Id.* at ¶ 19.
[48] *Id.* at ¶ 19.
[49] *Id.* at ¶ 19.
[50] *Id.* at ¶  22; *see also* ECF No. 1, Exhibit A.

that he chose not to bother himself with reading the Agreement before he executed it on behalf of SBD[51].   If Dr. Agatston, on behalf of SBD, believed that Mr. Etkin made the specific representations only now attributed to him for the first time in this lawsuit, he and SBD owed a duty to ECI to clarify the matter <u>before</u> signing the Agreement so that any misunderstandings could have been resolved.   However, while perhaps seemingly convenient for Dr. Agatston to testify that he did not to bother to read the Agreement, SBD is not relieved of the Agreement's terms and conditions. *See Rocky Creek Ret. Props. v. Estate of Fox*, 19 So.3d 1105, 1109 (Fla. 2d DCA 2009)("Florida law has long held that a party to a contract is conclusively presumed to know and understand the contents, terms, and conditions of the contract. A party has a duty to learn and know the contents of an agreement before signing it, and [a]ny inquiries . . . concerning the ramifications of [the contract] should have been made before signing.")(internal citations and quotations omitted); *see also Sabin v. Lowe's of Florida, Inc.*, 404 So.2d 772, 773 (5th DCA 1981)("No party to a contract in this state can defend against its enforcement on the sole ground that he signed it without reading it").

C.   *The Agreement Does Not Contain Any Of the Alleged Misrepresentations SBD Now Attempts to Attribute to ECI and Mr. Etkin*

The Agreement does not contain, nor does any term sheet or draft leading up to the final Agreement contain, any of the representations SBD now alleges were made by Mr. Etkin[52]. Courts have repeatedly held that "[i]t is deemed ***unreasonable as a matter of law*** to rely upon oral statement, ***even if falsely made***, where the written contract subsequently executed does not contain the alleged representations." *Hazara Enterprises, Inc. v. Motiva Enterprises, LLC*, 126 F. Supp. 2d 1365, 1374 (S.D. Fla. 2000).   Further, as the merger/integration clause put SBD on

---

[51] Statement of Material Facts in Support of Motion for Summary Judgment,  ¶ 19.
[52] *Id.* at ¶ 21; *see also* ECF No. 1, Exhibit A.

16

notice that the written Agreement would control, SBD could not have justifiably relied upon any alleged oral representations made by ECI and/or Mr. Etkin. *See Pinnacle Communications Int'l, LLC v. American Family Mortgage Corp.*, 417 F. Supp.2d 1073, 1089 (Minn. 2006); *SEB S.A. v. Sunbeam Corp.*, 148 Fed. Appx. 774 (11th Cir. 2005); *Johnson Enterprises of Jacksonville, Inc. v. FPL Group Capital, Inc.*, 162 F.3d 1290 (11th Cir. 1998).

> D.    *There Were No Specific Identifiable Representations Of Material Fact Made By ECI And/Or Mr. Etkin Other Than Work For Starbucks*

Perhaps most-stunning is the abject failure of SBD, as well as Dr. and Mrs. Agatston to substantiate, under oath, their allegations that Mr. Etkin made misrepresentations regarding his skills and experience[53].  To the contrary, there is no testimony – by anyone – that supports the allegations of the Counterclaim as we will show further below.  SBD's unsworn allegations are, as we have come to find out in deposition, admittedly based on nothing more than the Agatstons' **own** inferences and assumptions derived from Mr. Etkin's career experiences and experience, in particular, with Starbucks.  As Dr. Agatston testified, he just "assumed" that Mr. Etkin had the necessary experience based on his Starbucks experience[54].  In fact, Dr. Agatston admitted that Mr. Etkin's affiliation with Howard Schultz and Starbucks "was an important contribution to his perception of [Mr. Etkin's] credibility and experience[55]".

Accordingly, the instant case is now easily distinguished from the list of cases relied upon by SBD to support its argument that the merger/integration clause did not bar its claims[56].

---

[53] SBD's failure is a clear violation of Fed. R. Civ. P. 9(b). In order to satisfy Rule 9(b), a plaintiff must set forth (1) precisely what statements were made in what documents or oral representations or what omissions were made; (2) the time and place of each such statement and the person responsible for making same; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud. *Echeverria v. BAC Home Loans Servicing, LP*, Case No. 6:10-cv-1933, 2012 U.S. Dist. LEXIS 44487, *10 (M.D. Fla. March 30, 2012)
[54] Statement of Material Facts in Support of Motion for Summary Judgment, ¶ 21.
[55] *Id.* at ¶ 24.
[56] *See* ECF No. 112

Unlike the cases cited by SBD where the material representation of fact was specific [price of home, status of zoning, location of railroad tracks, commission on sale of yacht, providing employee background checks], SBD's fraud in the inducement and negligent misrepresentation claims are premised solely upon the following non-specific allegations:

> ECI and Etkin represented to SBD, through the Agatstons, that Etkin had vast experience in food distribution and licensing and could negotiate licensing issues, trademark issues, generate substantial growth of SBD, LLC and effectuate and complete the sale of SBD, LLC to a third party, preferably Starbucks, a company to which Etkin had close personal ties[57].
>
> ECI and Etkin stated that a minimum, SBD could establish a relationship with Starbucks, providing brand exposure and "ubiquity" in Starbucks stores and kiosks, with a goal of ultimately turning fresh food offerings into consumer packaged goods. ECI and Etkin spoke of his experiences on boards, in merger and acquisition deals, the lawyers he knew and worked with, and many deals he had previously brokered[58].
>
> Unbeknownst to SBD or the Agatstons, these representations were false. Neither ECI now Etkin had the necessary qualifications or experience. Specifically, Etkin did not have the management experience or any direct food management experience whatsoever that would allow either ECI or Etkin to provide the services rendered, nor did they hire any personnel to fill this significant gap in experience[59].

Specifically, with regard to Mr. Etkin's purported representation that he had "vast food distribution experience," according to SBD (and directly contrary to its allegations), the only statements Mr. Etkin made which SBD linked to food distribution related to Mr. Etkin's experience at Starbucks[60]. Beyond Mr. Etkin's anecdotal experiences at Starbucks, SBD did not, and could not, identify a single specific statement made by Mr. Etkin which represented that he had "vast food experience.[61]"

---

[57] ECF No. 92, ¶¶ 11, 73 and 86
[58] ECF No. 92, ¶¶ 12, 74 and 87
[59] ECF No. 92, ¶¶ 13, 75 and 88
[60] Statement of Material Facts in Support of Motion for Summary Judgment, ¶ 25.
[61] *Id.* at ¶ 26.

18

Further, Mr. Etkin's alleged "vast experience in licensing" was also an ***assumption*** made by SBD.   SBD admitted that because of "[Mr. Etkin's] handling of licensing and transactions at Starbucks, he ***seemed like*** . . . he was a licensing negotiating guru.[62]"   In fact, SBD conceded that the licensing and consumer packaged good transactions that Mr. Etkin talked about were primarily about Starbucks[63]. Unbelievably, SBD could not identify a single instance where Mr. Etkin represented that he was involved in a licensing transaction unrelated to Starbucks[64].

Mr. Etkin's purported ability to negotiate licensing and trademark issues was based upon another assumption drawn by SBD after Mr. Etkin offered his critique of SBD's 2004 Licensing Agreement with Kraft[65].   In fact, SBD has conceded, as it must, that this allegation is nothing more than ***Mrs. Agatston's impression*** that Mr. Etkin "had made some very interesting points about the agreement and that he would therefore understand and be in a position on [SBD's] future agreements to negotiate – to negotiate license agreements that would include and protect [SBD].[66]"   SBD also admitted that the critiques offered by Mr. Etkin concerned issues which SBD was already aware or previously advised by SBD employee and co-CEO, Margo Lowry[67]. Further, SBD admitted that Mr. Etkin did not say that he was an expert in trademark issues, but merely anecdotally described his experience with Starbucks and licensing the use of the Starbucks trademark on products[68].

---

[62] *Id.* at ¶ 28.
[63] *Id.* at ¶ 29.
[64] *Id.* at ¶ 30.
[65] *Id.* at ¶ 32.
[66] *Id.* at ¶ 32.
[67] *Id.* at ¶ 33.
[68] *Id.* at ¶ 34.

Not surprisingly, SBD couldn't even articulate what the Counterclaim meant when it referred to "direct food management experience"[69].  At most, SBD assumed that the allegation referred to Mr. Etkin having never managed a food company, a fact which it knew before it signed the Consulting Agreement[70].  Accordingly, this allegation may not form the basis of a fraud in the inducement and/or negligent misrepresentation claim.  Additionally, while the Counterclaim complained that ECI and/or Mr. Etkin did not hire personnel to fill an alleged significant gap in experience, SBD admits that it never asked or told ECI and/or Mr. Etkin to hire anyone at its expense, which of course would have been the proper subject of a notice to cure.[71]

In light of the foregoing, any method of analysis leads to the same conclusion - the merger/integration clause prevents SBD's proof of a necessary element of its claims, i.e. that it justifiably relied upon the purported oral representations made by ECI and/or Mr. Etkin.  SBD has admitted that ECI and Mr. Etkin made no misrepresentations. Accordingly, there are no genuine issues of material fact at issue, and the Court should enter judgment in favor of ECI and Mr. Etkin as to SBD's claims for fraud in the inducement and negligent misrepresentation.

Because SBD's Third Affirmative Defense[72] merely restates its fraud in the inducement claim, it fails for the same reasons as the main claim and the Court should enter summary judgment in favor of ECI and Mr. Etkin on this defense as well.

## VI.   SBD's First Affirmative Defense Is Barred Because The Contract Was Not Illegal

As its First Affirmative Defense, SBD states that the "Agreement is illegal and unenforceable in whole or in part because the services contemplated to be performed included business brokerage services in Florida and neither ECI or its principal, William Etkin hold the

---

[69] *Id.* at ¶ 36.
[70] *Id.* at ¶ 36.
[71] *Id.* at ¶ 39.
[72] ECF No. 92

required license under Florida law.[73]"  Despite any allegations by SBD to the contrary, ECI was not contracted to provide business broker services. Accordingly, ECI and/or Etkin didn't need a license. In fact, the Agreement enumerates the services ECI was to provide as follows: ". . . strategic planning, and financial and administrative matters regarding the Company and its businesses and all aspects of the Agatston Health Related Businesses (as defined below) conducted by affiliates of the Company with a view to increasing the Company's revenues and profits and the profits and revenues of the Agatston Health Related Businesses and positioning the Company and the Agatston Health Related Businesses to be sold in the future[74]". Under the terms of the Agreement, ECI was not retained to, and in fact, did not have the *authority* to "broker" a "sale" of SBD[75]. Further, the Agreement specifically acknowledges that on a sale of SBD, any commission or expenses incurred by SBD in connection with the sale would be *subtracted* from Mr. Etkin's sale bonus[76]. It is clear that the Agreement contemplated payment of a sales commission associated with the sale to a broker – not ECI.

However, even if the Court takes the statement as true, which it must for summary judgment purposes, SBD's attorney, Mr. Hall, admitted that the license was merely a curable breach of the contract. In fact, Mr. Hall stated:

> [If Mr. Etkin] wanted to cure the license part, hire somebody with a license.  He's a big boy.  He knows how to do that.  He doesn't have to have a license himself. ***He needs to get somebody that qualifies in the company . . .  he can fix it going forward***[77]

---

[73] ECF No. 92.

[74] ECF No. 1, Exhibit A.

[75] ECF No. 1, Exhibit A, ¶8 - Nothing herein shall be deemed to require any action or approval by the Company as a result of any suggestions, advice, plans or strategies provided as part of the Services.").

[76] ECF No. 1, Exhibit A, ¶4

[77] Deposition of Andrew Hall filed in conjunction with the Motion [page 173, lines 7-13].

By conceding that the license issue was curable, then the Court cannot conclude the Agreement to be illegal or unenforceable.

**VII.   SBD's Fourth Affirmative Defense [Fraud In Performance] Is Barred By The Economic Loss Rule**

SBD' s Fourth Affirmative Defense alleged that "ECI and Etkin have engaged in [f]raud in connection with rendering the Services required by the Agreement (i.e. Fraud in the Performance) as alleged with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure as alleged in the General Allegations of the Counterclaim (including but limited to Paragraphs 45, 47, 50, 54, 60, 61, 62, 63, 64, 68 and 69) which is incorporated by reference[78]." Florida law bars a claim for fraud in the performance where the parties are in contractual privity *See Indem. Ins. of  N. America v. American Aviation, Inc.*, 891 So.2d 532, 537 (Fla. 2004)(The economic loss rule bars a tort claim where there is not a breach of duty apart from a breach of contract.); *Hotel of Key Largo v. Rhi Hotels*, 694 So.2d 74 (Fla. 3d DCA 1997)(misrepresentations related to breaching party's performance of contract are barred by economic loss rule); *Yamashita v. Merck & Co.*, 2012 U.S. Dist. 17890, *3 (S.D. Fla. Feb. 13, 2012)(fraud in the performance is barred by the economic loss rule).  Because the affirmative defense alleges nothing more than ECI and/or Etkin's alleged fraud in the performance, the economic loss bars this defense, and the Court should grant summary judgment in favor of ECI and Mr. Etkin.

**VIII.   Conclusion**

In light of the foregoing, there are no genuine issues of material fact in dispute, and the Court should grant Etkin & Company, Incorporated and William Etkin's Motion for Summary

---

[78] ECF No. 92.

Judgment, and enter judgment as a matter of law in favor Etkin & Company, Incorporated and William Etkin on SBD's Counterclaim and its First, Second, Third and Fourth Affirmative Defenses.  Because SBD no longer has viable defenses to Etkin & Company, Incorporated's breach of contract action, it requests that the Court enter partial summary judgment in its favor in accordance with the Declaration attached to the Statement of Material Facts in Support of Motion for Summary Judgment.

Respectfully submitted this 9th day of May, 2012.

By:  s/ Franklin L. Zemel
Franklin L. Zemel
Florida Bar No. 816620
ARNSTEIN & LEHR LLP
200 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, Florida 33301
Ph: (954) 713.7610
Fax: (954) 713-7710
Email: flzemel@arnstein.com
*Attorneys for Etkin & Company, Inc*

23

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify that on May 9 2012, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     s/ Franklin L. Zemel

Orin Snyder
KatieLynn Townsend
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Ph: (212) 351-2400
Fax: (212) 351-6335
Email: osnyder@gibsondunn.com
ktownsend@gibsondunn.com

Franklin L. Zemel
Florida Bar No. 816620
ARNSTEIN & LEHR LLP
200 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, Florida 33301
Ph: (954) 713.7610
Fax: (954) 713-7710
Email: flzemel@arnstein.com
*Attorneys for Etkin & Company, Inc.*

10136984.2

6:19PM

### ETKIN & COMPANY, INCORPORATED V. SBD, LLC
### CASE NO.: 11-cv-21321-LENARD/O'SULLIVAN

### SERVICE LIST

Franklin L. Zemel
ARNSTEIN & LEHR LLP
200 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, Florida 33301
Ph: (954) 713.7610
Fax: (954) 713-7710
Email: flzemel@arnstein.com
*Attorneys for Etkin & Company, Inc.*

Orin Snyder
KatieLynn Townsend
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Ph: (212) 351-2400
Fax: (212) 351-6335
Email: osnyder@gibsondunn.com
ktownsend@gibsondunn.com
*Attorneys for Etkin & Company, Inc.*

Andrew C. Hall
HALL, LAMB, AND HALL, P.A.
2665 South Bayshore Drive, PH1
Miami, Florida 33133
Ph: (305) 374-5030
Fax: (305) 374-5033
Email: andyhall@hlhlawfirm.com
*Attorneys for SBD, LLC*

25